Filed 7/28/23  P. v. FuentesFlores CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>CARLOS FUENTESFLORES,<br><br>  Defendant and Appellant. | 2d Crim. No. B319175<br>(Super. Ct. No. 18F-11711)<br>(San Luis Obispo County) |

Carlos FuentesFlores appeals a judgment following conviction of first degree willful, deliberate, and premeditated murder, with findings that he committed the murder during the commission of rape and residential burglary.  (Pen. Code, §§ 187, subd. (a), 189, 261, 460, 190.2, subd. (a)(17)(C), (G).)[1]  We affirm.

This appeal concerns the murder of Nancy W., the owner of a rural property with horses in Paso Robles.  FuentesFlores was an employee of a painting contractor whom Nancy W. had hired

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

to paint her home. During police interviews, FuentesFlores admitted to raping and killing Nancy W. and showed detectives where he had disposed of her remains. FuentesFlores was later convicted of murder by a slow plea. On appeal, he raises issues concerning the voluntariness of his police interview statements and the relevance of his recorded jail telephone conversations. He also requests that we independently examine the trial court's review of the personnel file of San Luis Obispo County Sheriff's Detective Clint Cole. We review the court's in camera proceeding regarding Cole's personnel file, but reject FuentesFlores's other contentions.

*FACTUAL AND PROCEDURAL HISTORY*

On May 5, 2018, Nancy W.'s daughter and neighbor became concerned when Nancy W. did not appear for her usual morning walk. The neighbor went to Nancy W.'s residence and noticed that the porch lights and television were on and there were no linens on the bed. Nancy W.'s horses had not been fed. Nancy W.'s daughter also checked the residence and saw blood splatter on the wall, the floor, and a pillow.

Later that day, San Luis Obispo County Sheriff's Deputies entered the residence and saw dried blood on the floor and bloodstains on the carpet and a pillow. Nancy W.'s vehicle keys, purse, and computers were inside the residence. Her vehicles were parked outside.

A sheriff's detective obtained a search warrant for the records of Nancy W.'s landline telephone. The records revealed that a call was made to police emergency dispatch shortly after midnight on May 5, 2018, but the call did not connect.

Detective Cole spoke with the owner of the painting company that was working at Nancy W.'s residence. The owner

provided FuentesFlores's telephone number. On July 12, 2018, Cole telephoned FuentesFlores and spoke with him for approximately 13 minutes in the English language. FuentesFlores stated that Cole could contact him again and that he would return telephone calls.

A deputy obtained a search warrant for information from Google regarding the electronic devices that were in Nancy W.'s residence on May 5, 2018. The data indicated that a device associated with the e-mail of "carlofuentes0576" was inside her residence at 1:33 a.m. and 1:52 a.m.

*December 18, 2018, Police Interviews*

On December 18, 2018, Detective Devashish Menghrajani called FuentesFlores to ask further questions. FuentesFlores initially did not answer the call but returned the call quickly. FuentesFlores stated that he "was more than happy to come down" to the sheriff's station. At the station, Cole and Menghrajani did not frisk or search FuentesFlores for weapons but asked him to leave his cellular telephone in his vehicle. The detectives made arrangements for a Spanish language interpreter to be present if FuentesFlores requested one. The interview room door was unlocked and Menghrajani informed FuentesFlores that he was not detained or arrested, the door was not locked, and he could leave at any time. Several doors between the interview room and the outside were locked, however.

FuentesFlores stated that the detectives should "feel free" to ask him questions. Menghrajani asked that FuentesFlores let him know if he had any questions or did not understand the detectives' questions. FuentesFlores agreed. FuentesFlores stated that he has been living in the United States since 2001.

3

During the interview, FuentesFlores stated that he "made a mistake." FuentesFlores then stated that he went to Nancy W.'s home to retrieve a ladder and accidentally struck her with his truck. He later disposed of her body on the Carrizo Plain. FuentesFlores offered to show the detectives the location of her remains.

When the detectives asked FuentesFlores for more detail, FuentesFlores responded that he had sex with Nancy W. after he struck her with his truck. FuentesFlores then agreed to take the detectives to the location of Nancy W.'s body. At that point, Cole read FuentesFlores his *Miranda* rights in the English language. The officers then drove FuentesFlores to the Carrizo Plain where he eventually found the area where he had disposed of Nancy W.'s body. Cole found a skull and some bones near a rock formation. The remains were later identified through DNA testing as those of Nancy W.

The detectives and FuentesFlores returned to the station for further questioning. During this second interview, Cole disputed FuentesFlores's account and informed him that blood evidence revealed that Nancy W. was struck inside her residence. FuentesFlores then admitted that he believed Nancy W. was attracted to him; he entered her unlocked door, struck her in the face, and raped her.

Once again, Cole read FuentesFlores his *Miranda* rights in the English language. FuentesFlores then admitted that he smothered Nancy W. with a pillow. FuentesFlores stated that he was "makin[g] sure [he] didn't leave . . . any proof what [he] was doing." Following the interview, FuentesFlores wrote a lengthy apology letter in the English language to Nancy W.'s family. FuentesFlores asked for forgiveness from Nancy W.'s family and

4

God and asked that the family not harm FuentesFlores's family. FuentesFlores closed the letter stating, "Please pray for my family, to give them strength and deal with this situation."

Laboratory DNA analysis of the bloodstains and handprint on the pillow found in Nancy W.'s bedroom revealed that Nancy W. was a contributor to the stains. FuentesFlores could not be excluded as a contributor to DNA found on the pillow.

On August 4, 2020, October 13, 2020, February 16, 2021, and December 23, 2021, FuentesFlores filed various motions to challenge the voluntariness of his police interview statements. The trial court denied each motion.

On January 18, 2022, FuentesFlores stipulated to a court trial, slow plea, and evidentiary submissions. (*People v. Brown* (2023) 14 Cal.5th 530, 535 [under the slow plea procedure, "a defendant waives the right to jury trial and allows the court to decide the case based on . . . agreed-upon evidence"].) The stipulation provided that FuentesFlores would be found guilty of murder but would preserve his right to appeal.

On January 20, 2022, the trial court found FuentesFlores guilty of first degree willful, deliberate, and premeditated murder, and that he committed the murder while engaged in the commission of rape and residential burglary. (§§ 187, subd. (a), 189, 261, 460, 190.2, subd. (a)(17)(C), (G).) The court sentenced FuentesFlores to life imprisonment without possibility of parole, imposed various fines and fees, and awarded him 1,468 days of presentence custody credit.

FuentesFlores appeals and requests that we independently review Cole's personnel file pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). He also contends that the trial court erred by 1) permitting his police interview statements

5

in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and 2) allowing evidence of his recorded jail conversations with his wife. These errors, FuentesFlores argues, are cumulative and compel reversal of the judgment.

*DISCUSSION*

I.

FuentesFlores requests that we independently review the in camera hearing and sealed personnel records of Detective Cole to determine whether the trial court failed to disclose all relevant and discoverable information contained within the files pursuant to *Pitchess*, *supra*, 11 Cal.3d 531.

A defendant must establish good cause for discovery of a police officer's confidential personnel records that contain information relevant to the defense. (*Pitchess*, *supra*, 11 Cal.3d at pp. 537-538.) Good cause is a " 'relatively low threshold' " and requires a showing that 1) the personnel records are material to the defense, and 2) a stated reasonable belief that the records contain the type of information sought. (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1316.) Good cause contemplates "a logical link between the defense proposed and the pending charge." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1021.)

When the trial court finds good cause and conducts an in camera review pursuant to *Pitchess*, it must make a record that will permit future appellate review. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229-1230.) A court reporter should memorialize the statements made by the custodian of the police personnel records and any questions asked by the court. (*Id.* at p. 1229.) The court is afforded "wide discretion" in ruling on a motion for access to law enforcement personnel records. (*People v. Yearwood*

6

(2013) 213 Cal.App.4th 161, 180 [decision will be reversed only on a showing of abuse of discretion]; *People v. McDaniel* (2021) 12 Cal.5th 97, 134.)

Our review of the sealed personnel file and the transcript of the in camera hearing reveals that the trial court did not abuse its discretion by not disclosing any matters within the personnel file. The court properly conducted the *Pitchess* hearing and prepared a sufficient record for appellate review. The sealed personnel documents within Cole's file are not subject to disclosure. (*Warrick v. Superior Court*, *supra*, 35 Cal.4th 1011, 1021 [information in personnel file must be relevant to the litigation].)

## II.

FuentesFlores contends that the trial court erred by denying his motions to suppress the evidence of his interview statements. He contends that he was in custody for *Miranda* purposes, his invocation of counsel was ignored, and he should have been provided a Spanish language interpreter.

FuentesFlores first contends that *Miranda* warnings were required at the beginning of his police interview because he was in police custody. He points out that the interview room was small, the detectives sat near the door, other doors within the station hallway were locked, and the investigation was focused on him.

*Miranda* warnings are required only when a suspect interrogated by police is " 'in custody.' " (*Thompson v. Keohane* (1995) 516 U.S. 99, 107.) Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda*, *supra*, 384 U.S. 436,

7

444.)  Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact.  (*People v. Kopatz* (2015) 61 Cal.4th 62, 80.)  A reviewing court accepts the trial court's findings of historical fact if supported by substantial evidence, but independently determines whether interrogation was custodial.  (*Ibid.*)  The test for *Miranda* custody is whether a reasonable person would have felt he was not at liberty to terminate the interview and leave.  (*Ibid.*)

We agree with the trial court that *Miranda* admonitions were not required at the outset of the interview.  FuentesFlores was not arrested or detained, was informed that he was not under arrest and was free to leave, and was not subject to coercive questioning.  (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495 [no custody where defendant came voluntarily to police station and told immediately he was not under arrest]; *People v. Potter* (2021) 66 Cal.App.5th 528, 541-542 [no custody where defendant voluntarily went to police station, was not restrained or handcuffed, interview room door not locked, and questioning not particularly confrontational].)  When called by Menghrajani, FuentesFlores stated that he "was more than happy to come down" to the sheriff's station.

FuentesFlores was not frisked or searched for weapons.  He was informed that he was free to leave anytime and that the interrogation room door was unlocked.  FuentesFlores responded that the detectives should "feel free" to ask their questions and later expressed a desire to confess because Nancy W.'s death haunted him.  Although the first interview was approximately two hours, it was low-key, partly biographical, and not particularly confrontational.  (*People v. Moore* (2011) 51 Cal.4th 386, 402 ["police expressions of suspicion, with no other evidence

8

of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody"].)  During the drive to the Carrizo Plain, FuentesFlores was not handcuffed; the conversation was casual. The three men discussed golf.  FuentesFlores's interrogation was not custodial within the meaning of *Miranda* because a reasonable person in his situation would not have believed that he was not free to terminate the interrogation and leave.  (*People v. Kopatz*, *supra*, 61 Cal.4th 62, 80.)

FuentesFlores also argues that *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*) precludes admissibility of his interview statements.

*Seibert* applies to situations where a suspect is interviewed both before and after the giving of *Miranda* warnings.  (*Seibert*, *supra*, 542 U.S. 600, 605-606 [interrogation technique of question first, then warn, repeat questions until receiving same answers given prior to warning].)  Generally, "as long as both the initial unwarned statement and the subsequent warned statement are voluntary, the warned statement may be deemed the product of a defendant's 'rational and intelligent choice' to confess and so is admissible." (*People v. Krebs* (2019) 8 Cal.5th 265, 307.)

*Seibert* is inapplicable here because FuentesFlores was not in custody when first interviewed.  After offering to take the detectives to the area where he disposed of Nancy W.'s remains, FuentesFlores was read and waived his *Miranda* rights.  He continued to provide information to the detectives, including that he had sex with Nancy W.  Unlike *Seibert*, there is no evidence that the detectives intentionally or deliberately withheld *Miranda* warnings.

9

FuentesFlores next contends that he invoked his right to counsel by stating, "[N]ow . . . should I get a lawyer or what should be . . . next?" Cole responded that he could not give FuentesFlores legal advice.

A suspect who is questioned must clearly assert his right to counsel. (*People v. Molano* (2019) 7 Cal.5th 620, 659.) "Ambiguous or equivocal references to an attorney do not require cessation of questioning." (*Ibid.*) Clarifying questions regarding counsel are not required. (*Davis v. United States* (1994) 512 U.S. 452, 461-462; *Molano*, at p. 660.) "[W]e decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." (*Davis*, at pp. 461-462.)

FuentesFlores did not unequivocally invoke his right to counsel and the detectives were under no obligation to clarify his question. (*People v. Cunningham* (2015) 61 Cal.4th 609, 645 [" 'Should I have somebody here talking for me, is this the way it's supposed to be done?' " not an invocation of counsel]; *People v. Michaels* (2002) 28 Cal.4th 486, 510 [" 'I don't know if I should [talk] without a lawyer' " deemed equivocal statement that did not invoke counsel].) "There is no requirement law enforcement officers interrupt an interrogation to ask clarifying questions following a suspect's ambiguous or equivocal responses that might or might not be construed as an invocation of the right to an attorney." (*Cunningham*, at p. 646.)

Finally, FuentesFlores asserts that the failure to provide him a Spanish language interpreter during interrogation compels suppression of his interview statements. He relies upon the opinion of his expert witness, Doctor Silvia San Martin, a

linguistics expert, that he had a low to medium proficiency in English and was more familiar with informal English. San Martin explained that native Spanish-speakers had difficulty with English language vowel sounds, the passive voice, and the past tense.

A defendant who has limited English language skills may nevertheless knowingly, intelligently, and voluntarily waive his *Miranda* rights if the totality of circumstances indicates that he understood those rights when waived. (*People v. Salcido* (2008) 44 Cal.4th 93, 127-130.)

The totality of circumstances here reflects that FuentesFlores intelligently understood and waived his *Miranda* rights in the English language. FuentesFlores lived in the United States for at least 17 years and possibly 28 years (according to his brother). Detectives spoke with FuentesFlores several times during telephone calls and during the first interview, FuentesFlores acknowledged that he spoke "pretty good English." FuentesFlores did not demonstrate any difficulty in understanding the detectives during the interviews. He also used the English language when speaking to his wife during telephone conversations and in drafting a lengthy apology letter to Nancy W.'s family. Moreover, the trial court rejected the opinions of San Martin as conclusory and expressly found her not a credible witness.

*III.*

FuentesFlores argues that the trial court erred by permitting evidence of his recorded jail telephone conversations with his wife. He contends that the conversations are irrelevant because they are spoken in informal English.

11

Only relevant evidence is admissible. (Evid. Code, § 350.) Relevant evidence is defined as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) The court, in its discretion, may exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice. (*Id.*, § 352.)

The trial court possesses "considerable discretion" in determining the relevance of evidence. (*People v. Miles* (2020) 9 Cal.5th 513, 587.) Similarly, the court has broad discretion pursuant to Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudice. (*Miles*, at p. 587.) We review a court's ruling regarding relevancy and admissibility for an abuse of discretion. (*Ibid.*; *People v. Hardy* (2018) 5 Cal.5th 56, 87.)

The trial court did not abuse its discretion by permitting evidence of FuentesFlores's recorded jail conversations. During the conversations with his wife, FuentesFlores stated that he regretted the day (of the murder) and that he was now paying the consequences. He conceded that he did "the worse thing," and "a couple of bad things mixed together." The recorded conversations were in the English language; in placing the telephone calls, FuentesFlores selected English and not Spanish as the language for directions on using the jail telephones. The conversations were relevant to both FuentesFlores's guilt and his English language ability. Although the probative value of FuentesFlores's statements may have been minimal, the

12

statements were not irrelevant.  The weight of the statements was for the trier of fact to determine.  Moreover, undue prejudice, if any, was minimal.  (*People v. Lopez* (2021) 65 Cal.App.5th 484, 504-505 [admission made during jail conversation relevant and not unduly prejudicial].)  The court did not exercise its discretion in an arbitrary, capricious, or absurd manner when it admitted evidence of the conversations.  (*People v. Miles*, *supra*, 9 Cal.5th 513, 587-588.)

*DISPOSITION*

The judgment is affirmed.

NOT TO BE PUBLISHED.

GILBERT, P. J.

We concur:

BALTODANO, J.

CODY, J.

13

Timothy S. Covello, Judge

Superior Court County of San Luis Obispo

_____

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Blake Armstrong, Deputy Attorneys General, for Plaintiff and Respondent.